ROBBINS ARROYO LLP
BRIAN J. ROBBINS (#190264)
brobbins@robbinsarroyo.com
STEPHEN J. ODDO (#174828)
soddo@robbinsarroyo.com
EDWARD B. GERARD (#248053)
egerard@robbinsarroyo.com
JUSTIN D. RIEGER (#257321)
jrieger@robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

BOTTINI & BOTTINI, INC.
FRANK A. BOTTINI JR.(#175783)
fbottini@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SETH OLSON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RIVERBED TECHNOLOGY, INC., JERRY M. KENNELLY, MICHAEL BOUSTRIDGE, ERIC S. WOLFORD, KIMBERLY S. STEVENSON, CHRISTOPHER J. SCHAEPE, MARK S. LEWIS, MARK A. FLOYD, STEFFAN C. TOMLINSON, MICHAEL G. NEFKENS, THOMA BRAVO, LLC, PROJECT HOMESTAKE HOLDINGS, LLC, PROJECT HOMESTAKE MERGER CORP., and ELLIOTT ASSOCIATES, L.P., <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW AND DECLARATORY RELIEF |

CLASS ACTION COMPLAINT

## NATURE AND SUMMUARY OF THE ACTION

1.      Plaintiff Seth Olson, individually and on behalf of all others similarly situated, respectfully files this complaint against of Riverbed Technology, Inc. ("Riverbed" or the "Company"), Riverbed's Board of Directors (the "Board" or "Individual Defendants"), Thoma Bravo, LLC, Project Homestake Holdings, LLC ("Newco"), Project Homestake Merger Corp., a wholly-owned subsidiary of Newco ("Merger Sub" and with Thoma Bravo, LLC and Newco, "Thoma Bravo"), and Elliott Associates, L.P. ("Elliott").  This action arises out of defendants' violations of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, in connection with the sale of the Company to Thoma Bravo (the "Proposed Transaction") at the unfair price of $21 per share (the "Proposed Consideration").  This action also seeks a declaration that the Board's recently adopted inequitable and illegal Bylaws are invalid and inapplicable to this action.  Upon completion of the Proposed Transaction, Riverbed will be a wholly-owned subsidiary of Newco.

2.      At more than $1 billion in annual revenue, Riverbed is the leader in application performance infrastructure, delivering the most complete platform for location-independent computing.  Location-independent computing turns location and distance into a competitive advantage by allowing information technology ("IT") to have the flexibility to host applications and data in the most optimal locations while ensuring applications perform as expected, data is always available when needed, and performance issues are detected and fixed before end users notice. Riverbed's 25,000+ customers include 97% of both the Fortune 100 and the Forbes Global 100.

3.      Rather than allow the Company's shareholders to continue to benefit from Riverbed's market leading position, the Board has caved to the pressure from Elliott, a short-term, activist investor.  Elliott followed a normal process it has repeated numerous times of acquiring a large position in a company and then pushing for a sale.  To finally put the Company truly in play, Elliott announced that it was willing to purchase Riverbed for $21 per share.  The Board rejected that offer as undervaluing the Company and the Company's future.

4.      Nevertheless, ten months later, the Board was willing to accept this exact amount from Thoma Bravo, a long-time partner of Elliott.  The Board accepted this amount despite knowing

CLASS ACTION COMPLAINT

that there were multiple companies interested in acquiring Riverbed.  In fact, defendant Jerry M. Kennelly ("Kennelly") Riverbed's Chief Executive Officer ("CEO") and Chairman of the Board, accepted this $21 per share offer without consulting the Board, and only after Thoma Bravo asked him to continue on at the post-closing company for at least two years.

5.     The Board is well aware that the Proposed Consideration undervalues the Company. In addition to earlier stating the $21.00 per share consideration undervalued Riverbed, the Proposed Consideration is actually at a significant discount, 5.8%, to Riverbed's fifty-two week high of $22.28 on February 28, 2014.

6.     The Individual Defendants were financially motivated to sell the Company now, rather than allow Riverbed's stock to continue to appreciate over the long-term.  Management and members of the Board own a combined illiquid block of 5.47 million shares of Riverbed, worth nearly $115 million.  In addition, Riverbed's officers and directors will receive millions of dollars from the vesting of stock options, performance units, and restricted shares.  With over a hundred million dollars on the line, it is unsurprising that the Individual Defendants would favor a sale.

7.     The conflicts at issue in the Proposed Transaction do not end with just the Company's insiders.  The Board selected Goldman, Sachs & Co. ("Goldman Sachs") as one of its financial advisors.  Goldman Sachs, however, has repeatedly been involved in Thoma Bravo acquisitions, including serving as the financing for the buyers in one transaction.

8.     The only way defendants hope to convince Riverbed shareholders to endorse the flawed and self-serving process and the inadequate Proposed Consideration is to mislead them by disseminating to them a false and materially misleading Definitive Proxy Statement ("Proxy") in violation of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy, which seeks to solicit shareholder approval of the Proposed Transaction, specifically omits and/or misrepresents material information concerning: (i) the unfair and conflicted sales process resulting in the Proposed Transaction; (ii) the inputs and assumptions underlying the financial valuation analyses prepared by Riverbed's advisors – Qatalyst Partners ("Qatalyst") and Goldman Sachs – in connection with the rendering of their respective fairness opinions; and (iii) the financial projections relied upon by the financial advisors in preparing those analyses.

CLASS ACTION COMPLAINT

9.     Knowing that the unfair Proposed Transaction would face strong shareholder opposition, the Board enacted two Bylaws simultaneous to the signing of the Merger Agreement which attempt to limit where shareholders can bring challenges to the Proposed Transaction and to potentially penalize shareholders for bringing such a challenge.  As explained in more detail below, both of these Bylaws are illegal and inequitable.  Accordingly, plaintiff seeks a declaration that they are inapplicable to this action.

10.    Further, to remedy defendants' misconduct, as explained in more detail below, plaintiff seeks to enjoin the consummation of the Proposed Transaction unless and until the Company provides Riverbed shareholders with all material information relevant to their decision whether to approve the Proposed Transaction or to exercise their appraisal rights.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, 15 U.S.C. §78aa.

13.    Venue is proper in this District pursuant to section 27 of the Exchange Act and 28 U.S.C. §1391(b).

14.    This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## INTRADISTRICT ASSIGNMENT

15.    This action is properly assigned to the San Francisco division of this Court.

## PARTIES

16.    Plaintiff Seth Olson is, and at all times relevant hereto was, a stockholder of Riverbed.

17.    Defendant Riverbed is a Delaware corporation with headquarters located at 680 Folsom Street, San Francisco, California.  Upon completion of the Proposed Transaction, Riverbed

CLASS ACTION COMPLAINT

will become a wholly-owned subsidiary of defendant Thoma Bravo, LLC.

18.     Defendant Thoma Bravo, LLC, is one of the most active private equity firms in the software industry.  Defendant Thoma Bravo, LLC's current portfolio of software companies has aggregate revenues and profits of approximately $3 billion and $1 billion, respectively.  Defendant Thoma Bravo, LLC has completed fifty-four software and technology acquisitions with an aggregate value in excess of $7.5 billion.  Defendant Thoma Bravo, LLC typically invests in companies with revenues between $50 million and $500 million.

19.     Defendant Newco is a Delaware limited liability company.  Defendant Newco was formed by an affiliate of defendant Thoma Bravo, LLC.

20.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of defendant Newco.  Defendant Merger Sub was formed by an affiliate of defendant Thoma Bravo, LLC.

21.     Defendant Elliott is a Delaware limited partnership headquartered in New York, New York.  Founded in 1977, defendant Elliott is a hedge fund that takes an activist approach to investing, frequently accumulating significant but minority stakes in companies and attempting to impose corporate change.

22.     Defendant Kennelly is and an at all relevant time has been Riverbed's Chairman and CEO and a member of the Board.

23.     Defendant Michael Boustridge is and an at all relevant time has been a member of the Board.

24.     Defendant Eric S. Wolford is and an at all relevant time has been a member of the Board.

25.     Defendant Kimberly S. Stevenson is and an at all relevant time has been a member of the Board.

26.     Defendant Christopher J. Schaepe is and an at all relevant time has been a member of the Board.

27.     Defendant Mark S. Lewis is and an at all relevant time has been a member of the Board.

CLASS ACTION COMPLAINT

28.     Defendant Mark A. Floyd is and an at all relevant time has been a member of the Board.

29.     Defendant Steffan C. Tomlinson is and an at all relevant time has been a member of the Board.

30.     Defendant Michael G. Nefkens is and an at all relevant time has been a member of the Board.

FACTUAL ALLEGATIONS

**The Company and Its Products**

31.     Riverbed, founded in 2002, sells products to boost the performance of companies' software applications. It initially focused on a category called wide area network ("WAN") optimization, selling boxes that companies place in their data centers and branch offices to streamline the flow of data and make software work faster.  At more than $1 billion in annual revenue, Riverbed is the leader in application performance infrastructure, delivering the most complete platform for location-independent computing.  Location-independent computing turns location and distance into a competitive advantage by allowing IT to have the flexibility to host applications and data in the most optimal locations while ensuring applications perform as expected, data is always available when needed, and performance issues are detected and fixed before end users notice.  Riverbed's 25,000+ customers include 97% of both the Fortune 100 and the Forbes Global 100.

32.     Riverbed shipped its first SteelHead ™ WAN Optimization appliance in 2004.  Since its launch, SteelHead has been and continues to be the industry's #1 WAN optimization solution, winner of the InfoWorld 2013 Technology of the Year Award seven years running.  SteelHead has always been known for accelerating delivery of applications to the branch and now it also accelerates delivery of Software as a Service (SaaS) and cloud-based applications.  And, now with Path Selection technology, SteelHead can prioritize mission-critical applications for delivery over the fastest networks while delivering lower-priority applications over the Internet.

33.     Riverbed has expanded beyond its original value proposition with significant investments in innovation that led to the development of Riverbed SteelFusion™, a storage delivery

CLASS ACTION COMPLAINT

solution that reduces total cost of ownership (TCO) and expedites branch office backup, recovery, and restoration of applications and data after disasters or outages. In addition, Riverbed has acquired innovative technologies that solve related IT performance problems. Riverbed SteelApp™ is the most flexible application delivery controller (ADC) on the market and is recognized as the most visionary solution to optimize secure and scalable delivery of applications from private or public clouds to users anywhere. The acquisition of Mazu Networks, Inc. in 2009 and CACE Technologies, Inc. in 2010 led to the development of the Riverbed Network Performance Management (NPM) product line, and the acquisition of OPNET Technologies, Inc. in 2012 led to the development of Riverbed SteelCentral™ Application Performance Management (APM) products. Together, these make up the Riverbed Performance Management (RPM) product line, which provides enterprise-class end-user, APM and NPM to detect and fix performance problems before end users notice.

34.     All of these products come together in the Riverbed Application Performance Platform, which ensures applications perform as expected, data is always available when needed, and performance issues are detected and fixed before end users notice. Together with its partners, Riverbed offers the most complete platform for location-independent computing.

**The Proposed Transaction Is Announced**

35.     Despite Riverbed's most complete platform for location-independent computing, the Board decided, rather than continuing to pursue the Company's excellent standalone prospects, to sell Riverbed to Thoma Bravo.

36.     On December 15, 2014, Riverbed and Thoma Bravo announced in a press release that they had entered into a Merger Agreement dated December 14, 2014, pursuant to which Thoma Bravo will acquire the Company for per share consideration of $21 in cash. Upon completion of the Proposed Transaction, Riverbed will become a wholly-owned subsidiary of Thoma Bravo.

37.     The press release announcing the Proposed Transaction states, in pertinent part:

Riverbed to be Acquired by Thoma Bravo for $21.00 Per Share in Cash

Transaction Values Riverbed at Approximately $3.6 Billion

SAN FRANCISCO—December 15, 2014 – Riverbed Technology (RVBD), the

leader in application performance infrastructure, today announced that it has entered into a definitive agreement to be acquired by leading private equity investment firm Thoma Bravo, LLC and Teachers' Private Capital, the private investor department of Ontario Teachers' Pension Plan. Under the terms of the agreement, Riverbed stockholders will receive $21.00 per share in cash, or a total of approximately $3.6 billion. The agreement was unanimously approved by Riverbed's Board of Directors following a comprehensive review of strategic and financial alternatives that the Company announced in October, 2014.

"We are extremely pleased with this transaction, which we believe will be a winning proposition for all of our stakeholders," said Jerry M. Kennelly, chairman and CEO of Riverbed. "Having undertaken a thorough strategic review, during which we assessed a wide variety of options to maximize value, the Board unanimously concluded that partnering with Thoma Bravo was the best choice for Riverbed, as this transaction will provide our stockholders with significant and immediate cash value. Further, Thoma Bravo is a highly regarded private equity firm with deep experience in the technology industry and a 30-year track record of helping companies like ours flourish. With the benefit of Thoma Bravo's knowledge and insights, combined with the added flexibility we will have as a private company, Riverbed will be able to focus on reaching the next level of growth, which will benefit our employees, customers and partners."

"Riverbed's strong product portfolio provides unmatched optimization, visibility and control across the hybrid enterprise, which has positioned the Company extremely well in a rapidly-changing landscape," said Orlando Bravo, a managing partner at Thoma Bravo. "We look forward to working with the talented team at Riverbed to strengthen their leadership position and the value they deliver to customers. All of us at Thoma Bravo are excited to help Riverbed reach its full potential."

"This investment is the largest in Thoma Bravo's history, and it marks a continued emphasis on and confidence in companies that deliver mission-critical technologies for an expanding, global customer base," added Seth Boro, a managing partner at Thoma Bravo. "Riverbed is at the forefront, providing world-class solutions in application performance infrastructure to more than 25,000 customers worldwide, including 97 percent of the Fortune 100 and Forbes Global 100."

Riverbed CEO Jerry Kennelly will remain with the Company in the same capacity. The transaction, which is expected to close in the first half of 2015, is subject to approval by Riverbed stockholders, regulatory approvals, including antitrust review in the U.S., Germany and Taiwan, and review and clearance by the Committee on Foreign Investment in the U.S., and other customary closing conditions. There are no financing conditions associated with the proposed agreement.

Qatalyst Partners and Goldman, Sachs & Co. are serving as financial advisors to Riverbed, and Wilson Sonsini Goodrich & Rosati, Professional Corporation is serving as legal advisor. Kirkland & Ellis is serving as legal advisor to Thoma Bravo.

**Elliott's History for Shareholder Activism**

38. The process leading to the Proposed Transaction has been driven by one of Riverbed's

largest stockholders, Elliott, an activist investor, that holds over fifteen million Riverbed shares, or about 10.5% of the total shares outstanding. Elliott has been pushing for a sale of the Company since at least September 2014, and has threatened the Company and its Board that if Riverbed is not sold, Elliott will mount a proxy fight.

39.    The Proposed Transaction neatly fits the *modus operandi* used repeatedly by Elliott. Elliott's pattern is to: (i) acquire a position in a publicly traded company slightly above the threshold triggering the obligation to file a Report on Schedule 13D; (ii) leverage its stake to obtain board representation, often by threatening or commencing a proxy fight; (iii) pressure the target through criticism of its operations and leadership; (iv) make a public offer to acquire the target and/or manipulate the company from the inside to put it in play; and (v) combine with private equity investors to promote an acquisition bid. If Elliott succeeds, it acquires the balance of the equity at a bargain price. If a competing bid wins out, Elliott liquidates its stake for a quick profit.

40.    Elliott's portfolio manager in charge of technology investments, Jesse A. Cohn ("Cohn"), used this playbook, sometimes with the same Elliott-backed director and the same private equity sponsors, to benefit Elliott at the expense of public shareholders at least seven other times within the last seven years, including the sales of BMC Software, Inc. ("BMC"), Epicor Software Corporation ("Epicor"), Novell, Inc. ("Novell"), Blue Coat Systems, Inc. ("Blue Coat"), Metrologic Instruments, Inc. ("Metrologic"), MSC Software Corp. ("MSC") and Compuware Corporation ("Compuware"). Riverbed is the latest victim.

41.    In each instance, Elliott increased its holdings in the target above 7% of the outstanding common stock, met privately with members of management and/or the board, and successfully pushed the company into a sale to private equity firms. In five of these instances, Elliott either partnered with financial sponsors to submit joint acquisition proposals or agreed to roll its equity into the surviving company. Twice Elliott partnered with Golden Gate Capital, three times with Francisco Partners, and three times with Thoma Bravo, not including the Proposed Transaction.

42.    Cohn also utilized a combination of publicly disseminated letters and presentations to directors and management to apply pressure and advocate for a sale, as he did for Blue Coat, Novell, MSC, and BMC. Elliott successfully used proxy fights to push its way onto the boards and influence

CLASS ACTION COMPLAINT

the sale in the cases of Epicor, Metrologic and BMC.  Further, Cohn submitted unsolicited acquisition proposals to help spark the sales process in Epicor and Novell.

**Elliott Successfully Puts the Company in Play**

43.     Elliott targeted Riverbed for investment in late 2013, just as Riverbed increased revenue more than 22% in 2013, pushing the Company's annual sales higher than $1 billion and making it the fifty-sixth largest technology company in Silicon Valley.  On November 7, 2013, Elliott reported beneficial ownership of 14,515,586 shares of common stock of Riverbed, or approximately 9% of the Company's outstanding common stock. Together with economic exposure to approximately 1.5% of the common stock of Riverbed pursuant to certain derivative agreements, Elliott reported a combined voting power of approximately 10.4% of the Company's outstanding common stock.  In addition, Elliott disclosed that it has been in discussions with the Company's Board regarding certain operational, capital structure, and strategic review initiatives to increase the Company's valuation.

44.     On November 10, 2013, the Board decided to adopt a stockholder rights plan in response to Elliott's accumulation of shares, in order to protect Riverbed's ability to execute on its growth strategy while continuing to assess strategic alternatives from time to time and in order to ensure that stockholders have an opportunity to realize the long-term value of their investment.

45.     On December 5, 2013, Elliott disclosed that it had directly conveyed to the Board its views on the appropriate next steps Riverbed should take to increase shareholder value and Elliott's plans to promptly follow up with the Board.  Over the remainder of 2013, Riverbed management engaged in several discussions and communications with Elliott on Elliott's proposals for changes to Riverbed's operations.  During the course of these discussions, Elliott communicated that its primary focus was on the sale of Riverbed, and that it believed pursuing a sale of the Company was the best means of maximizing value for Riverbed stockholders.

46.     From November 2013 through early January 2014 prior to the receipt of Elliott's proposal discussed below, Riverbed and representatives of its financial advisor received six unsolicited inbound inquiries from private equity firms, including Thoma Bravo, soliciting Riverbed's interest in an acquisition transaction.  Based on the Board's determination to proceed with

management's standalone operating plan, however, Riverbed's Board determined that Riverbed should not engage in substantive discussions with any of the parties at such time.

47.     On January 8, 2014, Elliott filed with the SEC: (i) a letter to the Board offering to buy Riverbed for $19 per share in cash; and (ii) a form of a draft merger agreement with a "go-shop" provision permitting Riverbed to solicit competing acquisition proposals for a period of forty-five days following the signing date of a definitive merger agreement with Elliott.

48.     From January 8, 2014 through January 14, 2014, numerous private equity firms and one strategic party made contact with representatives of Riverbed's financial advisor to solicit Riverbed's interest in an acquisition transaction.  Such private equity firms consisted of five of the six firms that had previously expressed interest prior to the announcement of the Elliott acquisition proposal – including Thoma Bravo – as well as one additional private equity firm.  One additional strategic party made an inquiry regarding a potential asset sale of a division of Riverbed.

49.     On January 15, 2014, as communicated to the market in a press release, Riverbed announced that after consideration with independent advisors, the Board unanimously decided to reject Elliott's unsolicited proposal to acquire Riverbed for $19 per share in cash.  It was the Board's belief that Elliott's proposal significantly undervalued the Company relative to the potential stockholder value that could be created by effective execution on Riverbed's standalone operating plan and was not in the best interest of the Company's shareholders to engage in a sales process at that time.  The Company also released on the same day preliminary financial results indicating that fourth quarter 2013 revenue and earnings were expected to exceed previously announced guidance.

50.     On February 25, 2014, Elliott announced that was raising its unsolicited offer to acquire Riverbed to $21 per share in cash.

51.     On February 28, 2014, as communicated to the market in a press release, Riverbed announced that after consideration with its independent legal and financial advisors, the Board unanimously rejected Elliott's unsolicited proposal to acquire Riverbed for $21 per share in cash. It was the Board's belief that Elliott's $21 per share proposal continued to undervalue Riverbed relative to its value as an independent company and was not in the best interest of shareholders.

52.     In early March 2014, in an interview with *Bloomberg News*, defendant Kennelly

CLASS ACTION COMPLAINT

responded to Elliott's $21 per share offer by stating that no "serious" party had made a "credible" bid for the Company. At the same time, when asked at an investor conference whether the Company had received unsolicited offers in the $25 range, Riverbed's Chief Financial Officer Ernest E. Maddock ("Maddock") replied, "I think it's reasonable to assume that, had those existed, there would have been some response." When asked to explain the analysis behind the Board's belief that Elliott's $21 per-share bid undervalued the Company, Maddock stated, "We did the traditional math, and looked at growth rates … And the conclusion was that as things exist today, there is likely more opportunity in allowing the Company to continue to execute its plan."

53.     On April 29, 2014, Riverbed issued its earnings release for the first quarter of 2014, reporting positive revenue growth, with non-generally accepted accounting principles ("GAAP") revenue up 5% from the corresponding quarter of 2013 and meeting prior Riverbed guidance.

54.     On July 24, 2014, Riverbed announced financial results for the second quarter of 2014. Although the second quarter revenue results fell short of expectations, management remained confident in the Company's standalone operating plan. In Board meetings on July 22, 2014 and August 14, 2014, the Board discussed the standalone operating plan in light of Riverbed's recent operating performance and determined that Riverbed should continue to pursue the standalone plan at such time.

**The Board's "Process" Leading to the Proposed Transaction**

55.     Throughout October and November of 2014, at the request of the Board, representatives of Riverbed's financial advisors began a solicitation process of potential acquirors for Riverbed, and contacted twenty-three parties (ten strategic parties and thirteen private equity firms). Such parties included all of the private equity firms and the strategic party which had previously contacted representatives of Riverbed or its financial advisors to express their interest in an acquisition of the entire company, including Elliott, Thoma Bravo, and another bidder referred to in the Proxy as "Party A."

56.     On October 21, 2014, the Board met in a special meeting to discuss the pending expiration of the stockholder rights plan, which was due to expire on November 11, 2014, as well as an informal request by Elliott that had been communicated to Riverbed's financial and legal advisors

CLASS ACTION COMPLAINT

that the stockholder rights plan be amended to enable Elliott to increase its economic interest in Riverbed's securities to up to 15%.

57.     On November 5, 2014, the Board determined that it was in the best interests of Riverbed stockholders to extend the expiration date of the stockholder rights plan.  In addition, the Board determined that it was not in the best interests of Riverbed stockholders to permit Elliott to increase its economic interest in Riverbed's common stock in view of Elliott's pending offer to acquire the Company at $21 per share and the potential adverse impact on other bidders.

58.     In November 2014, the remaining eight parties (including Elliott) – all private equity firms – participating in the strategic and financial alternatives review process were informed via a process letter sent by Riverbed's financial advisors that Riverbed was seeking preliminary indications of interest for the sale of the entire Company by November 18, 2014.  On November 18, 2014, Riverbed received preliminary indications of interest from Thoma Bravo at $21.75 per share and from two of the other participants in the process: Party A, at between $21 to $22 per share, and another bidder, referred to in the Proxy as "Party B," at $21 per share.  Elliott declined to further participate in the process.

59.     On November 20, 2014, the Board discussed Thoma Bravo's request for the Board to name a price at which it would consider bypassing the bid process in favor of signing a definitive merger agreement with Thoma Bravo within a week of the submission of preliminary indications of interest.  Based on these discussions, the Board determined to suggest a price of $24.50 per share to Thoma Bravo, which the Board believed was within a plausible range of valuations for Riverbed, but sufficiently high as to remove reasonable doubt that a further bid process would yield a higher bid. On the same day, Thoma Bravo declined to make a revised offer at $24.50, but requested to remain in the bid process at its bid of $21.75 per share.

60.     On December 12, 2014, Thoma Bravo revised its bid downward to $20.50 per share. On December 13, 2014, representatives of Riverbed's financial advisors communicated to Thoma Bravo a counteroffer – which then capped what Riverbed's shareholders could ever hope to receive in a sale of the Company – at $21.50 per share.

61.     Later on the same day, Thoma Bravo contacted not the Board, but defendant

Kennelly, and indicated that it would be willing to raise the price per share to $21 in exchange for an informal commitment from defendant Kennelly that he remain with Riverbed for a minimum of two years post-closing. Defendant Kennelly, without consulting with the Board, orally agreed to the Thoma Bravo requests. Of course, then Thoma Bravo communicated to representatives of Riverbed's financial advisors that it was willing to offer $21 per share.

62.     The next day, and despite defendant Kennelly's public comments that Elliott's $21 per share offer was not credible, the Board's belief that Elliott's $21 per share proposal continued to undervalue Riverbed relative to its value as an independent company and was not in the best interest of shareholders, and the Board's view less than a month earlier that $24.50 per share was within a plausible range of valuations for Riverbed, the Board capitulated to Elliott and Thoma Bravo and agreed to sell the Company for just $21 per share.

**The Flawed Sales Process Was Infected with Disabling Conflicts of Interest**

63.     The process leading to the Proposed Transaction has been driven by Elliott, one of Riverbed's largest stockholders. The Board and management team's capitulation to Elliott is explained by their self-interest in causing a liquidity event. If the Proposed Transaction closes, Elliott will receive over $253.6 million from the sale of its illiquid Riverbed holdings. The Board and Company management own an additional illiquid block of over 5.47 million shares of Riverbed common stock, including options and restricted stock units. Thus, the Proposed Transaction also offers the Board and management a liquidity event, and if the Proposed Transaction closes, Board members and management will receive over $114.9 million from the sale of their illiquid block of Riverbed common stock in the Proposed Transaction.

64.     The Company's public stockholders do not share Elloitt's or the defendants' liquidity interests, as each stockholder can liquidate his or her Riverbed shares by selling into the market. But as a result of defendants' wrongful conduct, that opportunity to participate in Riverbed's expected long-term growth will be taken away from them and handed to Thoma Bravo for what is clearly an unfair price.

65.     The Board and Company management will not just enjoy a liquidity event; Riverbed's officers and directors are similarly conflicted because they will receive millions of dollars in special

payments – not being made to ordinary stockholders – for currently unvested stock options, performance units, and restricted shares, all of which shall, upon completion of the Proposed Transaction, become fully vested and exercisable. The Company's senior management is also entitled to receive from the Proposed Transaction millions more in change-of-control payments.

66.     With these special and change-of-control payments, all looming only upon a change in control, it is no surprise that the Board and Company management pursued a sale of the Company, even though Riverbed is the leader in application performance infrastructure, delivering the most complete platform for location-independent computing.

67.     Members of executive management are also staying on with the Company. Outside the presence of the Board, defendant Kennelly negotiated his own sweetheart deal to stay on with the post-closing company, while agreeing to Thoma Bravo's lowball offer of just $21 per share.

68.     The Board also taunted the process by selecting not one, but two, conflicted financial advisors. Goldman Sachs has been part of the Elliott/Thoma Bravo acquisition schemes on three previous occasions, serving as the seller's financial advisor in the Compuware and Blue Coat deals, and providing financing to the buyers group in Novell. Goldman Sachs also may have co-invested with Thoma Bravo and their respective affiliates from time to time and may have invested in limited partnership units of affiliates of Thoma Bravo from time to time and may do so in the future.

69.     Moreover, the Board agreed to pay both Goldman Sachs and Qatalyst outrageous contingent success fees. The Board agreed to pay Goldman Sachs approximately $30 million (before any reductions) in connection with transactions contemplated by the Merger Agreement, approximately $2.5 million of which was contingent upon the announcement of the Merger Agreement, and the remainder of which is both contingent upon the closing of the Proposed Transaction and will be reduced on account of credits for fees previously paid by Riverbed to Goldman Sachs. The Board similarly agreed to pay Qatalyst $30 million, almost $25 million of which will only be paid upon, and subject to, the successful consummation of the Proposed Transaction.

70.     Even though the Proposed Consideration is abysmally low, the Board did not consider just saying no to Elliott, Thoma Bravo, and a sale and pursuing Riverbed's standalone

opportunities.  And even though Elliott proposed it in its initial offer to acquire the Company, the Board never insisted on a "go-shop" period to evaluate market interest in the Company.  In so doing, the Board members served their own liquidity interests at the expense of maximizing stockholder value.

**The Conflicted and Unfair Process Led to the Unfair Proposed Consideration**

71.    The Board had a duty to maximize the value received by Riverbed's stockholders in a change-of-control transaction.  Despite that duty, the $21 per share Proposed Consideration represents a substantial negative premium of 5.8% to Riverbed's fifty-two-week high of $22.28 on February 28, 2014.  The $21 offer price – which the Board concluded in February 2014 undervalued Riverbed relative to its value as an independent company and was not in the best interest of shareholders – is substantially less than the $25 per share the Company stated in March 2014 would have merited a response.  The Proposed Consideration is also much less than the $24.50 that the Board viewed in late November 2014 was within a plausible range of valuations for Riverbed. Moreover, the Proposed Transaction appears to be taking advantage of a short term decline in the Company's profitability.  Riverbed's long-term financial outlook is positive.  Thoma Bravo is well aware of Riverbed's improving financial metrics and is purchasing Riverbed at a substantial discount.

**The Deal Protection Devices**

72.    Defendants agreed to certain deal protection devices that operate conjunctively to restrain the Company's ability to receive competing offers.  To protect against the threat of alternate bidders out-bidding Thoma Bravo after the announcement of the Proposed Transaction, defendants implemented deal protection devices that effectively hinder competing bids for Riverbed.

73.    The Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Thoma Bravo.  The Merger Agreement requires that the Company terminate any and all prior or on-going discussions with other potential acquirers.

74.    Pursuant to the Merger Agreement, in the event an unsolicited bidder submits a competing proposal, the Company must notify Thoma Bravo of the bidder's identity and the terms of

**CLASS ACTION COMPLAINT**

the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Thoma Bravo in order to enter into the competing proposal, it must give Thoma Bravo time in which the Company must negotiate in good faith with Thoma Bravo (if Thoma Bravo so desires) and allow Thoma Bravo to amend the terms of the Merger Agreement to make a counteroffer that Riverbed must consider in determining whether the competing bid still constitutes a superior proposal.

75.     The Merger Agreement grants Thoma Bravo information rights that require Riverbed to share highly sensitive information about competing proposals with Thoma Bravo.  In other words, the Merger Agreement gives Thoma Bravo access to any rival bidder's information and allows Thoma Bravo a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will favor Thoma Bravo.

76.     Finally, the Merger Agreement provides that Riverbed must pay Thoma Bravo a termination fee of $126 million if the Company decides to pursue a competing offer.

77.     Ultimately, these deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**THE INDIVIDUAL DEFENDANTS ISSUE A FALSE AND MISLEADING PROXY IN VIOLATION OF FEDERAL LAW**

78.     In an attempt to secure shareholder approval of the unfair Proposed Transaction, Riverbed with the SEC and disseminated to Riverbed shareholders the false and misleading Proxy on January 20, 2015.  As detailed herein, the Proxy misrepresents and/or omits material information necessary for Riverbed shareholders to make an informed decision whether to vote in favor of the Proposed Transaction in direct contravention of sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy omits and/or misrepresents the following material information concerning the

unfair sales process for the Company, the financial valuation analyses prepared by Riverbed's advisors – Qatalyst and Goldman Sachs – in connection with the rendering of their respective fairness opinions, and the financial projections prepared by Riverbed management and provided to its financial advisors.

79.     *Disclosure Deficiencies Concerning the Sales Process*: With respect to the sales process that led to the Proposed Transaction, the Proxy is materially deficient in that it fails to disclose:

(a)     the particular division of Riverbed that the strategic party was interested in in early January 2014;

(b)     as of January 14, 2014, the estimated value of Riverbed upon effective execution of the standalone operating plan;

(c)     the specific cost saving and operational measures explored by Riverbed management during the second and third quarters of 2014; and

(d)     the "plausible range of valuations for Riverbed" considered by the Board on November 20, 2014.

80.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 35 of the Proxy:

From January 8 through January 14, 2014, numerous private equity firms and one strategic party made contact with representatives of Riverbed's financial advisor to solicit Riverbed's interest in an acquisition transaction. Such private equity firms consisted of five of the six firms that had previously expressed interest prior to the announcement of the Elliott acquisition proposal – including Thoma Bravo – as well as one additional private equity firm. One additional strategic party made an inquiry regarding a potential asset sale of a division of Riverbed.

\*   \*   \*

On January 14, 2014, the Board of Directors met in a special meeting to consider the Elliott proposal. At the meeting, Riverbed's management presented the Company's five-year operating plan, together with updates to such plan since the Board of Directors' previous review of it in December. Representatives of Goldman Sachs presented its preliminary financial analysis of Riverbed based on those management plans. The Board of Directors discussed the merits and risks of pursuing a standalone

**CLASS ACTION COMPLAINT**

plan versus a sale strategy, as well as alternative debt or equity restructuring transactions. Representatives of Goldman Sachs presented the Board of Directors with a summary of the private equity interest in Riverbed, and further noted the relatively weak interest by strategic parties in Riverbed since Elliott's initial announcement. Representatives of WSGR reviewed with the Board of Directors its fiduciary duties in evaluating and responding to such interest and Elliott's proposal. The Board of Directors also discussed the specifics of Elliott's proposal, and determined that Elliott's proposal significantly undervalued Riverbed relative to the potential stockholder value that could be created by effective execution on Riverbed's standalone operating plan and that, as such, it was not in Riverbed's interests to engage in a sales process at that time.

(b)      from page 36 of the Proxy:

Throughout the second and third quarters of 2014, Riverbed management and the Board of Directors continued to explore additional cost saving measures and operational measures to improve Riverbed's financial and operating performance.

(c)      from pages 38-39 of the Proxy:

On November 20, 2014, the Board of Directors in a regular meeting met to discuss the preliminary indications of interest received in the strategic and financial alternatives review process. Representatives of Qatalyst Partners and Goldman Sachs reviewed the current status of the financial and strategic alternatives review process and discussions to date with participants in the process, the indicative bids received to date, and the scope of the process and management due diligence sessions. Representatives of Qatalyst Partners then presented its preliminary financial analysis of Riverbed to the Board of Directors, and representatives of Goldman Sachs then confirmed that the results of its analysis were generally consistent with those presented by representatives of Qatalyst Partners. The Board of Directors then discussed with management and Riverbed's advisors the next steps of the strategic and financial alternatives review process, including timing and parties involved. The Board of Directors also discussed Thoma Bravo's request for the Board of Directors to name a price at which it would consider bypassing the bid process in favor of signing a definitive merger agreement with Thoma Bravo within a week of the submission of preliminary indications of interest. Based on these discussions, the Board of Directors determined to suggest a price of $24.50 per share to Thoma Bravo, which the Board of Directors believed was within a plausible range of valuations for Riverbed, but sufficiently high as to remove reasonable doubt that a further bid process would yield a higher bid. The Board of Directors determined that, subject to Thoma Bravo's response to the $24.50 per share proposal, Qatalyst Partners and Goldman Sachs should invite all three bidders which had submitted preliminary indications of interest into the next round of the process. The Board of Directors determined to set a final bid deadline in early December based on the following considerations: to incentivize bidders to finish their diligence quickly in order to match the deal certainty offered in the Thoma Bravo proposal, and to prevent the solicitation process from being delayed into the following year with

CLASS ACTION COMPLAINT

related risks both to Riverbed's business and to the debt financing markets that would be used by any private equity firm in its bid for Riverbed.

81.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in paragraph 79 because they give shareholders a materially incomplete and distorted picture of the sales process underlying the Proposed Transaction and the various alternatives available to (and considered by) defendants.   Without this omitted information, Company shareholders cannot make a fully-informed decision whether to vote to approve the Proposed Transaction.

82.     *The Conflict Related Disclosures*: The Proxy also makes numerous material misstatements and otherwise fails to disclose material information about the conflicts of interests that burdened the Board, Company management, and their advisors, including:

(a)     the reasons the Board concluded it needed a second financial advisor;

(b)     whether the Board considered candidates other than Goldman Sachs or Qatalyst to serve as its financial advisor;

(c)     the bases on which the Board selected Goldman Sachs to serve as its financial advisor;

(d)     the bases on which the Board selected Qatalyst to serve as its financial advisor;

(e)     the amount of compensation Goldman Sachs has earned over the past two years from services provided to any of the parties in the Proposed Transaction;

(f)     the amount of compensation Qatalyst has earned over the past two years from services provided to any of the parties in the Proposed Transaction;

(g)     the amount of compensation Goldman Sachs has been paid for services rendered to any of the companies in its Selected Companies Analysis;

(h)     the co-investments or limited partnership interests Goldman Sachs or its affiliates have in either Thoma Bravo or the Ontario Teachers' Pension Plan ("OTPP") or any of their respective affiliates; and

(i)     the reasons the Board permitted defendant Kennelly to negotiate the final deal

- 19 -

CLASS ACTION COMPLAINT

price while simultaneously negotiating his continued employment with Riverbed post-merger.

83.     The omission of this information renders the following statements in the Proxy false

and/or materially misleading in contravention of the Exchange Act:

(a)     from page 34 of the Proxy:

On November 10, 2013, the Board of Directors met, in a special board meeting, to discuss Elliott's 13D and its proposals. In attendance were representatives of Riverbed's financial advisor, Goldman Sachs, whom Riverbed had engaged for purposes of advising on stockholder activism, and its legal advisor, Wilson Sonsini Goodrich & Rosati ("WSGR"). The Board of Directors reviewed Riverbed management's operating plan, including integration of the OPNET acquisition and the plans for growing Riverbed's product lines in addition to its core WAN optimization product line. Goldman Sachs delivered a presentation on Elliott's historical activities as a stockholder activist at other companies. WSGR delivered a presentation regarding stockholder rights plans, as well as fiduciary duty considerations for the Board of Directors in evaluating potential adoption of such a plan. The Board of Directors decided to adopt a stockholder rights plan in response to Elliott's accumulation of shares, in order to protect Riverbed's ability to execute on its growth strategy while continuing to assess strategic alternatives from time to time and in order to ensure that stockholders have an opportunity to realize the long-term value of their investment.

(b)     from page 37 of the Proxy:

At a meeting of the Board of Directors on September 8, 2014, after consideration of a number of factors including Riverbed's recent financial performance, the Board of Directors discussed initiating a strategic and financial alternatives review process. In connection with such process, the Board of Directors discussed engaging Qatalyst Partners as an additional financial advisor, as well as entering into a new engagement with Goldman Sachs in a similar capacity. On September 29, 2014, the Board of Directors in a special meeting directed management to pursue a process for the evaluation of strategic alternatives, and in that regard authorized the engagement of both Goldman Sachs and Qatalyst Partners to assist with the strategic and financial alternatives review process. Representatives of WSGR reviewed with the Board of Directors its fiduciary duties in connection with such a process.

(c)     from page 41 of the Proxy:

Later in the day on December 13, 2014, Thoma Bravo contacted Mr. Kennelly, and indicated that it would be willing to raise the price per share to $21.00 in exchange for an informal commitment from Mr. Kennelly to remain with Riverbed for a minimum of two years post-closing, and to continue to take steps to improve Riverbed's financial performance. Mr. Kennelly orally agreed to the Thoma Bravo requests. Thoma Bravo then communicated to representatives of Riverbed's financial advisors that it was willing to offer $21.00 per share.

- 20 -

(d)    From page 50 of the Proxy:

Qatalyst Partners provides investment banking and other services to a wide range of corporations and individuals, domestically and offshore, from which conflicting interests or duties may arise. In the ordinary course of these activities, affiliates of Qatalyst Partners may at any time hold long or short positions, and may trade or otherwise effect transactions in debt or equity securities or loans of Riverbed, Newco or certain of their respective affiliates. During the two year period prior to the date of Qatalyst Partners' opinion, no material relationship existed between Qatalyst Partners or any of its affiliates and Riverbed, Newco or Thoma Bravo pursuant to which compensation was received by Qatalyst Partners or its affiliates; however, Qatalyst Partners and/or its affiliates may in the future provide investment banking and other financial services to Riverbed, Newco or Thoma Bravo or any of their respective affiliates for which it would expect to receive compensation.

(e)    from pages 55-56 of the Proxy:

Goldman Sachs and its affiliates are engaged in advisory, underwriting and financing, principal investing, sales and trading, research, investment management and other financial and non-financial activities and services for various persons and entities. Goldman Sachs and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of Riverbed, Newco, any of their respective affiliates and third parties, including Thoma Bravo and OTPP and their respective affiliates and portfolio companies, or any currency or commodity that may be involved in the Merger. Goldman Sachs acted as financial advisor to Riverbed in connection with, and has participated in certain of the negotiations leading to, the Merger. Goldman Sachs expects to receive fees for its services in connection with the Merger, the principal portion of which is contingent upon consummation of the Merger, and Riverbed has agreed to reimburse certain of Goldman Sachs' expenses arising, and indemnify it against certain liabilities that may arise, out of its engagement. Goldman Sachs has provided certain financial advisory and/or underwriting services to Riverbed and/or its affiliates from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as sole financial advisor on Riverbed's acquisition of OPNET Technologies in December 2012; sole arranger for a bridge loan provided to Riverbed (aggregate principal amount of $575 million) in December 2012; and financial advisor to Riverbed in connection with its response to an unsolicited bid in 2014. Goldman Sachs also has provided certain financial advisory and/or underwriting services to Thoma Bravo and/or its affiliates and portfolio companies from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as sole arranger for a bridge loan (aggregate principal amount of $700 million) provided to Blue Coat Systems, a portfolio company of Thoma Bravo in May 2013 and as co-manager for a bank loan (aggregate principal amount of $50 million) provided to Blue Coat Systems in February 2014. Goldman Sachs also has provided certain financial advisory and/or

underwriting services to OTPP and/or its affiliates and portfolio companies from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as financial advisor to Aircastle LTD, a portfolio company of OTPP, in connection with a minority investment in June 2013; joint bookrunner on an initial public offering by ISS A/S, a portfolio company of OTPP, for an aggregate amount of DKK 9,425 million in March 2014; joint bookrunner on a senior notes offering by Aircastle LTD (aggregate principal amount $500 million) in March 2014; bookrunner on an initial public offering by INC Research Holdings, Inc., a portfolio company of OTPP, for an aggregate amount of $150 million in gross proceeds in November 2014; and joint bookrunner in a notes issuance by ISS A/S (aggregate principal amount of EUR 1.2 billion) in November 2014. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to Riverbed, Newco and their respective affiliates, and Thoma Bravo, OTPP and their respective affiliates and portfolio companies for which its Investment Banking Division may receive compensation. Affiliates of Goldman Sachs also may have co-invested with Thoma Bravo, OTPP and their respective affiliates from time to time and may have invested in limited partnership units of affiliates of Thoma Bravo and OTPP from time to time and may do so in the future. The Board of Directors selected Goldman Sachs as its financial advisor because it is an internationally recognized investment banking firm that has substantial experience in transactions similar to the Merger. Pursuant to terms of an engagement letter between Riverbed and Goldman Sachs, dated October 9, 2014 (the "Goldman Sachs Engagement Letter"), Riverbed engaged Goldman Sachs to act as its financial advisor in connection with the contemplated transaction. Pursuant to the Goldman Sachs Engagement Letter, Riverbed has agreed to pay Goldman Sachs a transaction fee of approximately $30 million (before any reductions) in connection with transactions contemplated by the Merger Agreement, approximately $2.5 million of which was contingent upon the announcement of the Merger Agreement, and the remainder of which is both contingent upon the closing of the Merger and will be reduced on account of credits for fees previously paid by Riverbed to Goldman Sachs. In addition, Riverbed has agreed to reimburse Goldman Sachs for its expenses, including attorneys' fees and disbursements, and to indemnify Goldman Sachs and related persons against various liabilities, including certain liabilities under the federal securities laws.

      (f)      from page 60 of the Proxy:

As of the date of this proxy statement, none of our executive officers has entered into any agreement with Newco or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. Prior to or following the closing of the Merger (but not prior to Riverbed and Thoma Bravo arriving at the $21.00 Per Share Merger Consideration), certain of our executive officers may have discussions, or may enter into agreements with, Newco or Merger Sub or their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.

CLASS ACTION COMPLAINT

84.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in paragraph 82 because they give shareholders a materially incomplete and distorted picture of the efforts taken (or not taken) by the Board to ensure that no conflicts of interest tainted the negotiation process, thus rendering it unfair to plaintiff and the other members of the Class (as defined herein). In order for there to be an informed vote by shareholders, defendants are required to disclose even potential conflicts of interest. Here the conflicts were more than potential, as Riverbed's financial advisors, Board members, and its management were conflicted. Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximized value.

85.     *Disclosure Deficiencies Concerning the Financial Valuation Analyses and the Underlying Inputs, Assumptions, and Financial Projections*: In the Proxy, defendants also make several material misleading statements or otherwise failed to disclose material information about critical data and inputs underlying the financial analyses supporting the fairness opinions of Riverbed's financial advisors Goldman Sachs and Qatalyst, including:

(a)     with respect to Qatalyst's Illustrative Discounted Cash Flow Analysis;

(i)     the definition of "unlevered free cash flow" utilized by Qatalyst in its analysis,

(ii)     the individual inputs and assumptions utilized by Qatalyst to derive the discount rate range of 10% - 16%;

(iii)     the implied perpetuity growth rate range resulting from this analysis, and

(iv)     given that Qatalyst did not observe net operating profit after taxes ("NOPAT") multiples, its basis for the selection of 10x – 15x 2019 NOPAT in its analysis;

(b)     with respect to Qatalyst's *Selected Companies Analysis*, whether Qatalyst performed any type of benchmarking analysis for Riverbed in relation to the selected public companies;

(c)     with respect to Goldman Sach's *Selected Companies Analysis*, the following benchmarking metrics for each of the selected public companies analyzed by Goldman Sachs:

CLASS ACTION COMPLAINT

        (i)      2014 – 2016 revenue compounded annual growth rate;

        (ii)     2015 non-GAAP gross margin;

        (iii)    2015 earnings before interest, taxes, depreciation, and amortization ("EBITDA") margin; and

        (iv)    2015 non-GAAP operating margin;

    (d)     with respect to Goldman Sach's Illustrative Discounted Cash Flow Analysis:

        (i)      the definition of "unlevered free cash flow" utilized by Goldman Sachs in its analysis;

        (ii)     whether the value of "net debt" utilized by Goldman Sachs includes long-term investments; and

        (iii)    Riverbed's estimated net debt as of December 12, 2014; and

    (e)     the financial projections provided by Riverbed management for fiscal years 2014 - 2018 for the following items:

        (i)      capital expenditures;

        (ii)     changes in net working capital;

        (iii)    any other adjustments to unlevered free cash flow; and

        (iv)    unlevered free cash flow.

    86.    The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

    (a)     from pages 41-42 of the Proxy:

On December 14, 2014, the Board of Directors reconvened in a special meeting to consider the terms of the proposed transaction. Also participating were certain members of Riverbed's management and representatives of Qatalyst Partners, Goldman Sachs and WSGR. The representatives of WSGR reviewed the terms of the draft merger agreement and described changes to the merger agreement which were finalized in the early morning with K&E, and reviewed certain other matters. The Board of Directors also discussed its view that the deal certainty of Thoma Bravo's offer at a price of $21.00 per share made it superior to Party B's bid and preferable to extending the process for Party B or Party D to complete further diligence. Representatives of Qatalyst Partners and Goldman Sachs reviewed with the Board of Directors their respective financial analyses of the proposed transaction. Following this presentation, representatives of Qatalyst Partners and Goldman Sachs delivered to the Board of Directors their respective oral opinions, subsequently confirmed in

writing, that, as of the date of their respective opinions and based upon and subject to the factors, assumptions, considerations, limitations and other matters set forth in their respective written opinions, the $21.00 Per Share Merger Consideration to be received by the holders of Riverbed common stock, other than Newco or any affiliates of Newco, pursuant to the Merger Agreement was fair, from a financial point of view, to such holders. For more information about Qatalyst Partners' and Goldman Sachs' respective opinions, see below under the headings "— Fairness Opinion of Qatalyst Partners" and "— Fairness Opinion of Goldman, Sachs & Co." After discussing potential reasons for and against the proposed transaction (see below under the heading "— Recommendation of the Board of Directors and Reasons for the Merger"), the Board of Directors unanimously determined that the Merger and the transactions contemplated by the Merger Agreement were at a price and on terms that were fair to, advisable and in the best interests of Riverbed and its stockholders, approved the Merger and Merger Agreement and recommended that Riverbed's stockholders vote to approve the Merger Agreement at any meeting of stockholders to be called for the purpose of acting thereon. The Board of Directors also adopted a resolution exempting Thoma Bravo, the Merger Agreement and the transactions contemplated thereby from the definition of "Acquiring Person" under Riverbed's stockholder rights plan such that Riverbed's stockholder rights plan would not apply to Thoma Bravo, the Merger Agreement and the transactions contemplated thereby, and another resolution authorizing amendments to Riverbed's Bylaws to provide that Delaware courts would be the exclusive forum for certain types of claims relating to the Company and to provide that the non-prevailing party in any suit challenging the foregoing bylaw would be liable for Riverbed's costs and expenses in connection with defending such litigation.

(b)       from pages 46-48 of the Proxy:

We retained Qatalyst Partners to act as a financial advisor to the Board of Directors in connection with a potential transaction such as the Merger and requested that Qatalyst Partners evaluate whether the $21.00 Per Share Merger Consideration to be received by the holders of our common stock, other than Newco or any affiliates of Newco, pursuant to the Merger Agreement was fair, from a financial point of view, to such holders. We selected Qatalyst Partners to act as a financial advisor based on Qatalyst Partners' qualifications, expertise, reputation and knowledge of our business and affairs and the industry in which we operate. Qatalyst Partners has provided its written consent to the reproduction of Qatalyst Partners' opinion in this proxy statement. At the meeting of the Board of Directors on December 14, 2014, Qatalyst Partners rendered its oral opinion that, as of such date and based upon and subject to the considerations, limitations and other matters set forth in the written opinion, the $21.00 Per Share Merger Consideration to be received by the holders of our common stock, other than Newco or any affiliates of Newco, pursuant to the Merger Agreement was fair, from a financial point of view, to such holders. Qatalyst Partners delivered its written opinion, dated December 14, 2014, to the Board of Directors following the meeting of our Board of Directors.

* * *

CLASS ACTION COMPLAINT

In arriving at its opinion, Qatalyst Partners reviewed the Merger Agreement, certain related documents, and certain publicly available financial statements and other business and financial information of Riverbed. Qatalyst Partners also reviewed our Management Projections, as defined and further described in the section captioned "The Merger — Management Projections", which contain certain forward-looking information prepared by our management, including our financial projections and operating data. Additionally, Qatalyst Partners discussed our past and current operations and financial condition and prospects with our senior executives. Qatalyst Partners also reviewed the historical market prices and trading activity for our common stock and compared our financial performance and the prices and trading activity of our common stock with that of certain other selected publicly-traded companies and their securities. In addition, Qatalyst Partners performed such other analyses, reviewed such other information and considered such other factors as Qatalyst Partners deemed appropriate.

In arriving at its opinion, Qatalyst Partners assumed and relied upon, without independent verification, the accuracy and completeness of the information that was publicly available or supplied or otherwise made available to, or discussed with, Qatalyst Partners by us. With respect to the Management Projections, Qatalyst Partners was advised by our management, and Qatalyst Partners assumed, that the Management Projections had been reasonably prepared on bases reflecting the best currently available estimates and judgments of our management of our future financial performance and other matters covered thereby. Qatalyst Partners assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement, without any modification, waiver or delay. In addition, Qatalyst Partners assumed, that in connection with the receipt of all the necessary approvals of the proposed Merger, no delays, limitations, conditions or restrictions will be imposed that could have an adverse effect on us or the contemplated benefits expected to be derived in the proposed Merger. Qatalyst Partners did not make any independent evaluation or appraisal of our assets or liabilities (contingent or otherwise), nor was Qatalyst Partners furnished with any such evaluation or appraisal. In addition, Qatalyst Partners relied, without independent verification, upon the assessment of our management as to our existing and future technology and products and the risks associated with such technology and products.

\* \* \*

The following is a brief summary of the material analyses performed by Qatalyst Partners in connection with its opinion dated December 14, 2014. The analyses and factors described below must be considered as a whole; considering any portion of such analyses or factors, without considering all analyses and factors, could create a misleading or incomplete view of the process underlying Qatalyst Partners' opinion. For purposes of its analyses, Qatalyst Partners utilized both the consensus of third-party research analysts' projections (the "Analyst Projections") and the Management Projections. The Analyst Projections do not reflect our sale of the SteelStore product line to NetApp, Inc. on October 27, 2014, as well as other contemplated product divestitures (collectively, the "Divestitures"). Qatalyst Partners adjusted the Analyst Projections to exclude the contribution of recognized revenue from technology

CLASS ACTION COMPLAINT

licensed and support services provided in exchange for a one-time cash payment from Juniper Networks, Inc. received in 2012 (the "Juniper Support Revenue"). Qatalyst Partners did not otherwise adjust the Analyst Projections to reflect the Divestitures. The Management Projections reflect the Divestitures. In addition, for purposes of its selected companies analysis, and based on discussions with management, Qatalyst Partners adjusted the Management Projections to exclude the Juniper Support Revenue. Considering the data set forth below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Qatalyst Partners' financial analyses.

> (c)     from page 48 of the Proxy:

Qatalyst Partners performed an illustrative discounted cash flow analysis, which is designed to imply a potential, present value of share values for our common stock as of December 31, 2014 by:

- adding:

     (a) the implied net present value of the estimated future unlevered free cash flows of Riverbed, derived from forecasted non-GAAP operating income based on the Management Projections with adjustments provided by Riverbed management, including adding depreciation and decreases in working capital and subtracting capital expenditures and taxes, for calendar year 2015 through calendar year 2018 (which implied present value was calculated by using a range of discount rates of 10.0% to 16.0%, based on an estimated weighted average cost of capital for Riverbed);

     (b) the implied net present value of a corresponding terminal value of Riverbed, calculated by multiplying the estimated non-GAAP net operating profit after taxes ("NOPAT") (assuming an effective tax rate of 26.5%) in calendar year 2019, based on the Management Projections, by a range of multiples of enterprise value to 2019 estimated NOPAT of 10.0x to 15.0x and discounted to present value using the same range of discount rates used in item (a) above; and

     (c) our estimated net cash as of December 31, 2014, as projected by our management, including the estimated impact of the Divestitures;

- applying a dilution factor of 18% to reflect the dilution to current stockholders over the projection period due to the effect of future equity compensation grants projected by our management; and

- dividing the resulting amount by the number of fully-diluted shares of our common stock outstanding, adjusted for stock options and restricted stock units outstanding and projected to December 31, 2014 based on estimates by our management, using the treasury stock method.

Based on the calculations set forth above, this analysis implied a range of values for our common stock of approximately $14.68 to $22.90 per share.

CLASS ACTION COMPLAINT

(d)      from pages 48-49 of the Proxy:

Qatalyst Partners compared selected financial information and public market multiples for Riverbed with publicly available information and public market multiples for selected companies. The companies used in this comparison are listed below and were selected because they are publicly traded companies in our industry and based on Qatalyst Partners' professional judgment.

### Selected Companies

Aruba Networks, Inc.
Brocade Communications Systems, Inc.
Cisco Systems, Inc.
F5 Networks, Inc.
**JUNIPER NETWORKS, INC.**

Based upon research analyst consensus estimates for calendar year 2015 and using the closing prices as of December 12, 2014 for shares of the selected companies, Qatalyst Partners calculated, among other things, the implied price to earnings per share multiple for calendar year 2015 ("CY15E P/E Multiple"), for each of the selected companies. The low, median and high CY15E P/E Multiple among the selected companies analyzed were 11.9x, 12.9x and 19.8x, respectively.

Based on an analysis of CY15E P/E Multiples for the selected companies, Qatalyst Partners selected a representative range of 12.0x to 14.0x for the CY15E P/E Multiples and applied this range to our calendar year 2015 expected earnings per share based on each of the Management Projections and the Analyst Projections, as adjusted to exclude the Juniper Support Revenue. This analysis implied a range of values for our common stock of approximately $14.12 to $16.47 per share based on the Management Projections and approximately $13.73 to $16.02 per share based on the Analyst Projections, as adjusted to exclude the Juniper Support Revenue.

No company included in the selected companies analysis is identical to Riverbed. In evaluating the selected companies, Qatalyst Partners made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters. Many of these matters are beyond our control, such as the impact of competition on our business and our industry in general, industry growth and the absence of any material adverse change in our financial condition and prospects, the industry or in the financial markets in general. Mathematical analysis, such as determining the median, high or low, is not in itself a meaningful method of using selected company data.

(e)      from page 49 of the Proxy:

In connection with the review of the Merger by the Board of Directors, Qatalyst Partners performed certain financial and comparative analyses for purposes of rendering its opinion. The preparation of a financial opinion is a complex process and is not necessarily amenable to a partial analysis or summary description. In arriving at its opinion, Qatalyst Partners considered the results of all of its analyses as a whole

CLASS ACTION COMPLAINT

and did not attribute any particular weight to any analysis or factor it considered. Qatalyst Partners believes that selecting any portion of its analyses, without considering all analyses as a whole, could create a misleading or incomplete view of the process underlying its analyses and opinion. In addition, Qatalyst Partners may have given certain analyses and factors more or less weight than other analyses and factors and may have deemed certain assumptions more or less probable than other assumptions. As a result, the ranges of valuations resulting from any particular analysis described above should not be taken to be Qatalyst Partners' view of the actual value of Riverbed. In performing its analyses, Qatalyst Partners made numerous assumptions with respect to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond our control. Any estimates contained in Qatalyst Partners' analyses are not necessarily indicative of future results or actual values, which may be significantly more or less favorable than those suggested by such estimates.

       (f)      from pages 50-52 of the Proxy:

Goldman Sachs rendered its opinion to the Board of Directors that, as of December 14, 2014 and based upon and subject to the factors and assumptions set forth therein, the $21.00 Per Share Merger Consideration to be paid to the holders of our common stock (other than Newco and its affiliates), pursuant to the Merger Agreement was fair from a financial point of view to such holders.

\*    \*    \*

In connection with rendering the opinion described above and performing its related financial analyses, Goldman Sachs reviewed, among other things:

- the Merger Agreement;

- annual reports to stockholders and Annual Reports on Form 10-K of Riverbed for the five years ended December 31, 2013;

- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of Riverbed;

- certain other communications from Riverbed to its stockholders;

- certain publicly available research analyst reports for Riverbed; and

- certain internal financial analyses and forecasts for Riverbed prepared by its management for the remainder of 2014 and calendar years 2015-2019, as approved for Goldman Sachs' use by Riverbed (the "Forecasts").

\*    \*    \*

For purposes of rendering the opinion described above, with the consent of the Board of Directors, Goldman Sachs relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting, and other

information provided to, discussed with or reviewed by it, without assuming any responsibility for independent verification thereof. In that regard, Goldman Sachs assumed, with the consent of the Board of Directors, that the Forecasts were reasonably prepared on a basis reflecting the best currently available estimate and judgments of the management of Riverbed. Goldman Sachs did not make an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or other off-balance-sheet assets and liabilities) of Riverbed or any of its subsidiaries, nor was any evaluation or appraisal of the assets or liabilities of Riverbed or any of its subsidiaries furnished to Goldman Sachs. Goldman Sachs assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the Merger will be obtained without any adverse effect on the expected benefits of the Merger in any way meaningful to its analysis. Goldman Sachs has also assumed that the Merger will be consummated on the terms set forth in the Merger Agreement, without the waiver or modification of any term or condition the effect of which would be in any way meaningful to its analysis.

*   *   *

The following is a summary of the material financial analyses delivered by Goldman Sachs to the Board of Directors in connection with rendering the opinion described above. The following summary, however, does not purport to be a complete description of the financial analyses performed by Goldman Sachs nor does the order of analyses described represent relative importance or weight given to those analyses by Goldman Sachs. Some of the summaries of the financial analyses include information presented in tabular format. The tables must be read together with the full text of each summary and are alone not a complete description of Goldman Sachs' financial analyses. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before December 12, 2014 and is not necessarily indicative of current market conditions.

(g)    from pages 52-53 of the Proxy:

Goldman Sachs reviewed and compared certain financial information for Riverbed to corresponding financial information, ratios and public market multiples for the following publicly traded corporations in the communications technology industry:

• Aruba Networks, Inc.

• Brocade Communication Systems, Inc.

• Citrix Systems, Inc.

• F5 Networks, Inc.

• Juniper Networks, Inc.

Although none of the selected companies is directly comparable to Riverbed, the companies included were chosen because they are publicly traded companies with

operations that for purposes of analysis may be considered similar to certain operations of Riverbed.

Goldman Sachs also calculated and compared various financial multiples and ratios based on the Forecasts and median estimates from Institutional Brokers' Estimate System (or IBES) as of December 12, 2014. The multiples and ratios of Riverbed were calculated using the Riverbed closing stock price on December 12, 2014. The multiples and ratios of Riverbed were based on the Forecasts and IBES estimates (and exclude the Divestitures per Riverbed management). The multiples and ratios of Riverbed were calculated based on Riverbed's outstanding shares as of December 11, 2014, as provided by Riverbed management. For purposes of these calculations, Riverbed non-GAAP revenue included an adjustment for deferred revenue and Riverbed non-GAAP gross margin, EBITDA margin, non-GAAP operating margin and non-GAAP earnings included adjustments for amortization of intangibles, stock-based compensation expense and one-time expenses. The multiples and ratios for each of the selected companies were based on information as of December 12, 2014. With respect to Riverbed and the selected companies, Goldman Sachs calculated:

- enterprise value, which is the fully diluted market value of common equity plus cash, cash equivalents, short-term investments and long-term investments less debt, as a multiple of 2015E non-GAAP revenue, and, in the case of Riverbed's management projections, includes the Divestitures per Riverbed management guidance; and

- enterprise value as a multiple of 2015E earnings before interest, taxes, depreciation and amortization (or EBITDA), with depreciation in the case of the comparable companies and the Riverbed IBES estimates estimated based on the ratio of depreciation to revenue from the last available fiscal year.

The results of these analyses are summarized as follows:

| Enterprise Value as a multiple of 2015E: | Selected Companies | | Riverbed (Management) | Riverbed (IBES) |
|---|---|---|---|---|
| | Range | Median | | |
| Non-GAAP Revenue | 1.7x-4.3x | 2.3x | 2.7x | 2.8x |
| EBITDA | 6.7x-11.0x | 9.4x | 9.3x | 10.1x |

Goldman Sachs also calculated the selected companies' and Riverbed's calendar year 2015E price/earnings ratios and price/earnings ratios to growth rate ratio (or P/E/G), which in the case of Riverbed were based on the Forecasts and IBES estimates. For purposes of calculating P/E/G, Goldman Sachs used the estimated growth rate in revenue between calendar years 2014 and 2016. The following table presents the results of this analysis:

| Ratio: | Selected Companies | | Riverbed (Management) | Riverbed (IBES) |
|---|---|---|---|---|
| | Range | Median | | |
| 2015E Price/Earnings | 11.9x-19.9x | 16.3x | 14.8x | 15.2x |
| 2015E P/E/G | 1.0x-10.4x | 2.1x | 1.8x | 3.7x |

CLASS ACTION COMPLAINT

Goldman Sachs also considered the compounded annual growth rate of non-GAAP revenue for 2014 — 2016 and 2015 estimated non-GAAP gross margin, EBITDA margin and non-GAAP operating margin.

The following table presents the results of this analysis:

| | Selected Companies | | Riverbed | Riverbed (IBES) |
| | Range | Median | (Management) | |
|---|---|---|---|---|
| 2014 — 2016 Compound Annual Growth Rate of Non-GAAP Revenue | 1.2%-15.6% | 7.8% | 8.0% | 4.1% |
| 2015E Non-GAAP Gross Margin | 64.1%-84.9% | 72.1% | 79.0% | 78.9% |
| 2015E EBITDA Margin | 24.1%-39.0% | 27.9% | 28.9% | 28.0% |
| 2015E Non-GAAP Operating Margin | 21.4%-36.9% | 23.5% | 25.9% | 25.0% |

(h)    from pages 53-54 of the Proxy:

Goldman Sachs performed an illustrative discounted cash flow analysis on Riverbed using the Forecasts. For purposes of this analysis, Q4 2014 and 2015 to 2019 estimated cash flows excluded the Divestitures pursuant to adjustments provided by Riverbed management. In this analysis, Goldman Sachs utilized forecasted unlevered free cash flow of Riverbed, which is cash flow from operating activities (adjusted to exclude interest income and expense and the associated tax effects), less forecasted capital expenditures, in each case as provided by Riverbed management. For purposes of calculating unlevered free cash flow, stock based compensation was treated as a cash expense. Illustrative per share value indications were calculated using fully diluted outstanding shares of Riverbed common stock, including the effect of changes in outstanding shares through the anticipated consummation of the Merger using information provided by Riverbed management. Using discount rates ranging from 10.5%-12.5%, reflecting estimates of Riverbed's weighted average cost of capital, Goldman Sachs calculated an illustrative range of enterprise values for Riverbed by discounting to present values as of December 12, 2014, estimates of the unlevered free cash flows for Riverbed for the years 2014 through 2019, and illustrative terminal values in the year 2019 based on perpetuity growth rates of unlevered free cash flows ranging from 2.50% to 3.50%. Goldman Sachs calculated implied equity value per share of Riverbed by subtracting the value of Riverbed's net debt, according to the Forecasts inclusive of the Divestitures per Riverbed management projections, and dividing the result by the number of fully diluted outstanding shares of Riverbed common stock, including the effect of changes in outstanding shares through the anticipated consummation of the Merger using information provided by Riverbed management. These illustrative terminal values were then discounted to calculate implied indications of present values using illustrative discount rates ranging from 10.5% to 12.5%, reflecting estimates of Riverbed's weighted average cost of capital. In addition, Goldman Sachs reviewed the forward EBITDA multiples (before stock based compensation expense) implied by the range of terminal values resulting from the indicative range of perpetuity growth rates used in the discounted cash flow analysis described above. This analysis resulted in implied forward EBITDA multiples ranging from 4.5x-6.5x.

The illustrative discounted cash flow analysis resulted in illustrative per share value indications ranging from $13.33-$18.10.

CLASS ACTION COMPLAINT

(i)    from page 54 of the Proxy:

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Goldman Sachs' opinion. In arriving at its fairness determination, Goldman Sachs considered the results of all of its analyses and did not attribute any particular weight to any factor or analysis considered by it. Rather, Goldman Sachs made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of its analyses. No company or transaction used in the above analyses as a comparison is directly comparable to Riverbed or the contemplated transaction.

(j)    from page 58 of the Proxy:

The Management Projections are forward-looking statements. For information on factors that may cause Riverbed's future results to materially vary, see the information under the section captioned "Forward-Looking Statements."

**Riverbed — Management Projections**
*($MM)*

|  | Actual | Projections | | | | |
|---|---|---|---|---|---|---|
|  | FY'2013 | FY'2014 | FY'2015 | FY'2016 | FY'2017 | FY'2018 |
| Non-GAAP Revenue | $ 1,057 | $1,050 | $1,129 | $1,225 | $1,340 | $1,463 |
| Non-GAAP Gross Profit | $ 835 | $ 826 | $ 892 | $ 968 | $1,059 | $1,156 |
| Non-GAAP Operating Income | $ 243 | $ 254 | $ 292 | $ 329 | $ 377 | $ 429 |
| Non-GAAP Net Income | $ 169 | $ 180 | $ 206 | $ 233 | $ 269 | $ 307 |
| EBITDA | $ 265 | $ 284 | $ 326 | $ 361 | $ 407 | $ 459 |
| Cash Flow from Operating Activities | $ 217 | $ 218 | $ 285 | $ 323 | $ 358 | $ 402 |
| Capital Expenditures | ($ 25) | (51) | (32) | (32) | (32) | (32) |

58

87.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in paragraph 85 for a variety of reasons.  First, there are a number of different line items that can be included in the calculation of unlevered free cash flows which, depending on what definition is used, can impact the valuation resulting from a discounted cash flow ("DCF") analysis like those conducted by Riverbed's advisors.  It is likewise well established that the calculation of a discount rate requires the application of a number of objective inputs and assumptions and the ultimate discount rate selected often has the single largest impact on a resulting DCF valuation. Shareholders must therefore be provided insight into the reasonableness of a financial advisor's discretionary application of the inputs and assumptions used to compute the discount rate range selected.

88.     Second, a benchmarking analysis is essential when comparing entities for valuation purposes as the selection of multiples when conducting a market valuation analysis is only

worthwhile if those multiples are chosen from entities with growth and profitability profiles similar to the company being valued.  Whether a benchmarking analysis was performed by Qatalyst and/or Goldman Sachs in connection with their respective Selected Companies Analyses is therefore material to shareholders' ability to truly evaluate the merits of those analyses and, more importantly, the fairness opinions as a whole.  Indeed, without the individually observed multiples omitted from the Proxy, shareholders are unable to determine for themselves whether the multiples applied to the financials for Riverbed are representative of the selected comparable companies that are most similar to the Company.  Likewise, the results of a proper benchmarking analysis would allow shareholders to determine whether the selected comparable companies are actually appropriate for use in determining an implied value for Riverbed shares.

89.     Finally, with respect to the omissions concerning the Company's financial forecasts, the omitted information is integral to shareholders' evaluation of the consideration being offered in the Proposed Transaction.  Indeed, these financial projections provide a sneak peek into the Company's expected future performance and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and others as it comes from corporate insiders with their hands on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought after disclosures by shareholders in the context of corporate transactions such as this.  Additionally, these projections form the backbone of the DCF analyses prepared by Goldman Sachs and Qatalyst.  Without this omitted information, Company shareholders cannot make a fully-informed decision whether to vote to approve the Proposed Transaction.

*  *  *

90.     Ultimately, there is no more material information to shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares.  Shareholders are entitled to the information necessary to inform a decision as to the adequacy of the Proposed Consideration, which includes the underlying data (including management's projections) the investment bankers relied upon, the key assumptions that the financial advisors used in performing

CLASS ACTION COMPLAINT

valuation analyses, and the range of values that resulted from those analyses. Here the analyses of Goldman Sachs and Qatalyst incorporated certain critical assumptions and projections that significantly affect the output (valuation) of their analyses which is omitted or materially misrepresented in the Proxy. Without this material information, shareholders have no basis on which to judge the adequacy of Thoma Bravo's offer.

91.     Defendants' failure to provide Riverbed shareholders with the foregoing material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of this material information prior to the shareholder vote on the Proposed Transaction, plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## THE BOARD ADOPTS ILLEGAL BYLAWS

92.     On December 15, 2014, in conjunction with and at the same time as entering into the Merger Agreement, the Board enacted two new Bylaws. The first Bylaw states that unless Riverbed consents in writing, any action asserting a: (i) breach of fiduciary duty claim; (ii) claim arising pursuant to Delaware General Corporation Law; or (iii) claim governed by the internal affairs doctrine must be brought in either federal or state court located within the state of Delaware (the "Exclusive Forum Bylaw").

93.     The Board also adopted a Bylaw that stated that any current or former shareholder that initiates an action outside of Delaware shall be liable to Riverbed and any party aligned with Riverbed for all fees, costs, and expenses that they may incur in connection with the litigation (the "Fee Shifting Bylaw").

94.     As an initial matter, a claim brought under the federal securities laws does not fall under one of the enumerated claims that would subject this action to the Exclusive Forum Bylaw on its face. Even if this was not the case, the Exclusive Forum Bylaw is preempted by federal law. 15 U.S. Code section 78aa(a) states that an action brought under federal securities laws "may be

brought in any … district of which the defendant is found or is an inhabitant or transacts business." Accordingly, Congress has provided investors wide latitude in where to file an action brought under federal securities laws. The Board cannot unilaterally restrict the right that Congress has provided investors.

95. The Exclusive Forum Bylaw is also inapplicable to this action because the Board adopted the Bylaw after plaintiff purchased his stock and at a time it knew it was about to face litigation over its wrongful conduct. Notably, plaintiff purchase his Riverbed stock before the wrongdoing at issue in this action occurred.

96. Accordingly, plaintiff seeks a declaration that the Exclusive Forum Bylaw does not apply to this action.

97. Since the Exclusive Forum Bylaw is inapplicable, and the Fee Shifting Bylaw is predicated on the Exclusive Forum Bylaw, the Fee Shifting Bylaw is likewise inapplicable to this action.

98. Even if the Fee Shifting Bylaw was applicable to this case, it is preempted by federal law. Congress already addressed the issue of fee-shifting in litigation concerning federal securities laws when it enacted the Private Securities Litigation Reform Act (the "PSLRA"). Since Congress has already acted in the in this field, the Board cannot trump the rules of the PSLRA.

99. Even if the Fee Shifting Bylaw was not pre-empted, it violates Delaware corporate law. 8 Delaware Code sections 102(a)(4) and 151(a) require that the certificate of incorporation set forth the rights and limitations of stock ownership. Under 8 Delaware Code section 109(b), a bylaw cannot contain any provision that is inconsistent with the company' certificate of incorporation. Since the certificate of incorporation does not contain fee shifting, a bylaw has no power to impose it.

100. The Fee Shifting Bylaw is also invalid under Delaware law because it attempts to impose personal liability of the debts of the corporation on its stockholders. 8 Delaware Code section 102(b)(6) provides that the certificate of incorporation must contain "[a] provision imposing personal liability for the debts of the corporation on its stockholders to a specified extent and upon specified conditions; otherwise, the stockholders of a corporation shall not be personally liable for

CLASS ACTION COMPLAINT

the payment of the corporation's debts except as they may be liable by reason of their own conduct or acts."

101. Further, the Fee Shifting Bylaw is unequitable as applied. For instance, the Fee Shifting Bylaw imposes the corporation's debt in defending the action on the plaintiff regardless of whether plaintiff succeeds in the action.

102. Therefore, plaintiff seeks a declaration that the Fee Shifting Bylaw invalid.

## CLASS ACTION ALLEGATIONS

103. Plaintiff brings this action individually and as a class action on behalf of all holders of Riverbed stock who are being and will be harmed by defendants' actions described herein (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

104. This action is properly maintainable as a class action.

105. The Class is so numerous that joinder of all members is impracticable. Pursuant to the Merger agreement, there are more than 157 million shares of Riverbed common stock issued and outstanding as of December 11, 2014.

106. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

(a) whether defendants have failed to disclose material information to stockholders in violation of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder in connection with the Proposed Transaction;

(b) whether plaintiff and the other members of the Class will suffer irreparable injury if the Proposed Transaction complained of herein is consummated; and

(c) whether the Company's Exclusive Forum and Fee Shifting Bylaws are invalid.

107. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

108. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the

Class.

109.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

110.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

111.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder Against the Individual Defendants

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Company and its Board disseminated the false and materially misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    The Proxy was prepared, reviewed, and/or disseminated by the Board and Riverbed. It misrepresented and/or omitted material facts, including material information about the unfair and conflicted sales process, the inadequate consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company.

115.    The Company and its Board were at least negligent in filing the Proxy with these false and materially misleading statements included therein.

116.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view full and accurate disclosures as significantly altering the "total mix" of information made available in the Proxy and in other

information reasonably available to shareholders.

117.   By reason of the foregoing, Riverbed and the members of its Board have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

118.   As a result of the false and materially misleading Proxy, plaintiff and the other members of the Class are threatened with irreparable harm, rendering money damages inadequate.

119.   Injunctive relief is therefore appropriate to ensure the Exchange Act violations are corrected.

## COUNT II

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

120.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.   The Individual Defendants acted as controlling persons of Riverbed within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements in the Proxy.

122.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and the other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

123.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Board members to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

124.    In addition, as the Proxy sets forth at length, and as described herein, the Board members were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Board.

125.    As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Proxy.

126.    By virtue of these facts, the Individual Defendants have violated and are liable to plaintiff and the other members of the Class pursuant to section 20(a) of the Exchange Act.

## COUNT III

### For Declaratory Relief Against All Defendants

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    As explained above, the Exclusive Forum Bylaw is inapplicable to this action. Similarly, the Fee Shifting Bylaw is invalid.

129.    Plaintiff seeks a declaratory judgment that the Exclusive Forum Bylaw is inapplicable to this matter and the Fee Shifting Bylaw is invalid.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment, including injunctive relief, as follows:

A.    Declaring that the Company's Exclusive Forum and Fee Shifting Bylaws are invalid;

B.    Declaring that this action is properly maintainable as a class action;

C.    Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company discloses all material information to stockholders;

D.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

CLASS ACTION COMPLAINT

E.      Granting such other and further relief as this Court may deem just and proper.

Dated: February 5, 2015                          ROBBINS ARROYO LLP
                                                 BRIAN J. ROBBINS
                                                 STEPHEN J. ODDO
                                                 EDWARD B. GERARD
                                                 JUSTIN D. RIEGER


                                                         /s/ Brian J. Robbins
                                                 BRIAN J. ROBBINS

                                                 600 B Street, Suite 1900
                                                 San Diego, CA 92101
                                                 Telephone:  (619) 525-3990
                                                 Facsimile: (619) 525-3991
                                                 brobbins@robbinsarroyo.com
                                                 soddo@robbinsarroyo.com
                                                 egerard@robbinsarroyo.com
                                                 jrieger@robbinsarroyo.com

                                                 BOTTINI & BOTTINI, INC.
                                                 FRANK A. BOTTINI JR.
                                                 7817 Ivanhoe Avenue, Suite 102
                                                 La Jolla, CA 92037
                                                 Telephone: (858) 914-2001
                                                 Facsimile: (858) 914-2002
                                                 fbottini@bottinilaw.com

                                                 Attorneys for Plaintiff

1008463

CLASS ACTION COMPLAINT

# CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Seth Olson ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.　Plaintiff has reviewed the Class Action Complaint and has retained Bottini & Bottini, Inc. and Robbins Arroyo LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

2.　Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.　Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| RVBD | Purchase | 140 | 7/27/2011 | $32.3999 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

4.　Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.　Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

_____

6.　Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.　Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of February, 2015.

_____
SETH OLSON